IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| ROBERT E. DAVIS, | ) | |
|     Plaintiff | ) | |
| | ) | |
| v. | ) | No. 2:10-0088 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
|     Acting Commissioner of Social Security[1] | ) | |

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 17) should be GRANTED and that the decision of the ALJ should be reversed and benefits awarded.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On October 26, 2004, the plaintiff protectively filed applications for DIB and SSI benefits, alleging a disability onset date of August 24, 2004, due to a back injury "and related medical conditions" and left-eye blindness. (Tr. 79-81, 91, 686-88.) His claims were denied initially and upon reconsideration. (Tr. 52-54, 68-71, 73-74, 677-84.) A hearing was held before Administrative Law Judge ("ALJ") Joan A. Lawrence on January 10, 2007. (Tr. 689-707.) On August 28, 2007, the ALJ issued an unfavorable decision denying benefits. (Tr. 58-67.) On May 1, 2008, the Appeals Council vacated the ALJ's decision and remanded the case in order for the ALJ to obtain additional evidence and further evaluate the plaintiff's mental impairment. (Tr. 38-39.) A second hearing was held before ALJ Lawrence on May 27, 2009 (tr. 708-30), and on August 31, 2009, the ALJ again issued an unfavorable decision. (Tr. 12-24.) On July 23, 2010, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 5-7.)

# II. BACKGROUND

The plaintiff was born on April 16, 1964, and he was forty years old as of his alleged onset date. (Tr. 79.) He attended school resource classes through the ninth grade (tr. 95, 153-58, 713), and he previously worked as a carpenter's helper, pallet builder, loader for a door manufacturer, and at various other heavy labor jobs. (Tr. 91-92, 713-15, 727.)

## A. Chronological Background: Procedural Development and Medical Records

### 1. Mental Impairments

On December 27, 1974, Winston Rutledge, a school psychologist for the Cumberland County school system, evaluated the plaintiff, who was then a ten-year-old third grader. (Tr. 161.) Mr. Rutledge noted that the plaintiff was unable to sign his complete name, which "suggest[ed] retardation in intellectual function." *Id.* Mr. Rutledge administered the house-tree-person ("HTP") test,[2] the Bender Visual-Motor Gestalt test ("Bender designs"),[3] and the Wechsler Intelligence Scale for Children ("WISC").[4] *Id.* According to Mr. Rutledge, the plaintiff's HTP drawings were "reasonably ade[q]uate" but "suggest[ed] lowering of intellect," his Bender designs indicated "immaturity," and his WISC results evidenced "mild retardation." *Id.* Mr. Rutledge concluded that the plaintiff functioned "at the level of mild mental retardation" except that his verbal functioning was "at the borderline level." *Id.* Mr. Rutledge recommended that the plaintiff be placed "in a learning resource class for help with basic academic work" and that he "should have the material adapted to his own level." *Id.*

---

[2] In the HTP test, "the test taker is asked to draw houses, trees, and persons, and these drawings provide a measure of self-perceptions and attitudes." *House-Tree-Person Test*, Encyclopedia of Mental Disorders, http://www.minddisorders.com/Flu-Inv/House-tree-person-test.html#b (last visited January 28, 2014).

[3] The Bender designs test is "a psychological test used for evaluating perceptual-motor coordination, for assessing personality dynamics, as a test for organic brain impairment, and for measuring neurological maturation. The subject is asked to make free-hand copies of nine simple geometric designs presented separately on cards or sometimes to reproduce the design from memory." Dorland's Illustrated Medical Dictionary 210, 1869 (30th ed. 2003) ("Dorland's").

[4] The WISC is a "group of tests for assessment of intellectual functioning in children age 5 to 15." Dorland's at 1660.

Mr. Rutledge reevaluated the plaintiff on October 20, 1978, when the plaintiff was a fourteen-year-old seventh grader. (Tr. 160.) Mr. Rutledge noted that the plaintiff's HTP drawings were "rather immature and suggest[ed] dulling of intellect;" his Bender designs evidenced "no apparent visual-motor disability;" his WISC-R[5] results indicated relative weakness in all areas; and his Wide Range Achievement Test ("WRAT")[6] reading and spelling grade levels were 2.2 and 2.6, respectively. *Id.* Mr. Rutledge recommended that the plaintiff be kept in the resource program for "reasons of low level function of intellect." *Id.*

On February 20, 1981, Mr. Rutledge reevaluated the plaintiff, who was then a sixteen-year-old ninth grader. (Tr. 159.) His HTP drawings again "suggest[ed] dulling of intellect;" his Bender designs were "low average" and evidenced "a residual of a former visual-motor disability;" and his WISC-R results indicated that his verbal ability was at about 70% of average, his performance ability was at about 64% of average, and his total function of intellect was at about 64% of average. *Id.* His WRAT results indicated reading and spelling grade levels of 2.5 and 3.0, respectively. *Id.* Mr. Rutledge recommended that the plaintiff be kept in the resource program for "reasons of low level function of intellect" but noted that the plaintiff's "potential may be some higher" and recommended a vocational program. (Tr. 159.)

As an adult, the plaintiff sought mental health treatment from Volunteer Behavioral Health Care System ("Volunteer"). (Tr. 664-76.) At his initial assessment on September 22, 2005, he was

---

[5] The original WISC was updated in 1974 as the WISC-R. *See WISC-R*, Fast Track Project, http://www.fasttrackproject.org/techrept/w/wsr/ (last visited January 28, 2014).

[6] The WRAT is a "test that evaluates a child's basic skills of spelling, mathematics and reading–i.e., educational achievement." *WRAT*, McGraw-Hill Concise Dictionary of Modern Medicine, http://medical-dictionary.thefreedictionary.com/WRAT (last visited January 28, 2014).

diagnosed with "adjustment disorder, with mixed anxiety and depressed mood, chronic" and alcohol dependence, and he was assigned a Global Assessment of Functioning ("GAF") score of 58.[7] (Tr. 674.) On the same day, Jeraldine Ziegele, Ed.S., a Volunteer staff member, completed a Tennessee Clinically Related Group ("CRG") assessment, opining that the plaintiff had moderate limitations in the areas of activities of daily living; interpersonal functioning; concentration, task performance, and pace; and adaptation to change. (Tr. 661-63.)

The plaintiff was discharged from Volunteer for lack of contact on March 16, 2006 (tr. 675), but he returned on January 18, 2007, with complaints of depression, panic attacks, racing thoughts, weight loss, and daily crying spells. (Tr. 625.) He reported that his depression and anxiety stemmed from back pain, which prevented him from working, and that he had daily stress from caring for his daughter. *Id.* He reported that he had attempted suicide in the 1990s and had a history of substance abuse. *Id.* He rated his depression as an 8 out of 10 and said that he was at a "breaking point" in his life. (Tr. 627.) A diagnosis for "major depressive disorder, recurrent, moderate" was added and he was assigned a GAF score of 50. (Tr. 608, 628.) A Volunteer CRG assessment completed January 18, 2007, assessed moderate impairments in all four functional categories. (Tr. 606-08.) He was discharged from Volunteer again on July 16, 2007, for failing to attend appointments. (Tr. 629.)

On October 10, 2007, Jerell Killian, M.S., performed a psychological evaluation of the plaintiff at the request of his attorney. (Tr. 373-75.) The plaintiff obtained a verbal IQ score of 66,

---

[7] The GAF is used to assess the social, occupational, and psychological functioning of adults. A GAF score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").

a performance IQ score of 63, and a full scale IQ score of 62 on the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III").[8] (Tr. 374.) On the WRAT-Fourth Edition ("WRAT-IV"), he obtained a reading score of 56, a third-grade equivalent, and an arithmetic score of 68, a fourth-grade equivalent. *Id.* Mr. Killian indicated that these results were in the mild mental retardation range and were consistent with the plaintiff's school records and adaptive functioning. *Id.* He opined that the plaintiff had "moderate limitations in ability to calculate and moderate to severe limitations in reasoning, comprehension, memory, and reading" and concluded that the "availability of employment which could permit circumvention of [the plaintiff's] physical problems and these cognitive and educational limitations is unlikely." (Tr. 375.)

A crisis assessment report was completed by Volunteer staff on April 8, 2008, after the plaintiff was arrested, drank shampoo, and threatened to commit suicide. (Tr. 616-17, 621.) He later said that he drank the shampoo because he thought it was lice medicine that he was supposed to drink and that he made the suicidal statement out of anger with no actual intent to act. (Tr. 616.) He was diagnosed with "major depressive disorder, recurrent, moderate" and given a GAF score of 44.[9] (Tr. 619.) He signed a safety plan and was released with an intake appointment set for April 17, 2008, at Cumberland Mountain Mental Health Center. *Id.*

On August 25, 2008, Stephen Hardison, M.A., a Tennessee Disability Determination Services ("DDS") consultative examiner, performed a psychological examination of the plaintiff. (Tr. 399-

---

[8] The WAIS is "a group of tests for assessment of intellectual functioning in adults." Dorland's at 1660.

[9] A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34.

403.) The plaintiff reported that he was divorced and was taking parenting classes to regain custody of his daughter, who he reported was in state custody. (Tr. 399.) He also reported that he lived alone but had a female friend who stayed with him "part of the time." *Id.* Mr. Hardison noted that the plaintiff said that he typically "does not get along too good with others and does not trust people." (Tr. 400.) He reported that he was formerly a heavy drinker but had not been a heavy drinker since 2006. *Id.* He admitted that he still drank alcohol and that he smoked marijuana "every day if [he] had it." *Id.*

The plaintiff told Mr. Hardison that he had received treatment through Volunteer for "nerves" and that he had been taking Celexa[10] for several years after he told his physician that he could not "handle life." *Id.* He reported a history of suicidal thoughts including one attempted suicide. *Id.* He relayed that he had trouble sleeping and concentrating on puzzles, sometimes forgot to pay bills, and did not have a bank account, although he previously had one that his girlfriend managed. *Id.* He reported that he did chores "sometimes," including mopping, sweeping, laundry, and washing dishes, but that his "female friend . . . "help[ed] him with most chores." (Tr. 401.) He said that he drove to the store approximately once a month, could count money "pretty good," visited with his father about once a week, got along with his neighbor, walked around his neighborhood, played cards and Nintendo, attended church, and attended a "training class" once a week. *Id.*

On the WAIS-III, the plaintiff obtained a verbal IQ score of 64, a performance IQ score of 63, and a full scale IQ score of 61, placing him in the mild mental retardation range. (Tr. 402.) The plaintiff's results on the WRAT-IV showed that he performed arithmetic at the 2.5 grade level and

---

[10] Celexa is a selective serotonin reuptake inhibitor used to treat major depression or generalized anxiety disorder. Saunders Pharmaceutical Word Book 141-42 (2009) ("Saunders").

read at the 1.9 grade level, indicating functional illiteracy. *Id.* Mr. Hardison diagnosed him with mild mental retardation, anxiety not otherwise specified ("NOS"), cannabis abuse, and a history of alcohol abuse. *Id.* He opined that the plaintiff was able to "remember and carry out basic one or two-step instructions with no significant problems," but cautioned that his "ability to remember and carry out more detailed instructions would seem mildly to possibly moderately limited." *Id.* Mr. Hardison further opined that the plaintiff's ability to "sustain concentration and persistence for extended periods of time would seem no more than mildly limited in a low stress environment" and that his ability to complete work tasks without interruption from psychologically-based systems was "no more than mildly limited." (Tr. 403.) The plaintiff's ability to interact appropriately with coworkers, supervisors, or the general public was "mildly to possibly moderately limited at times," and his ability to respond appropriately to changes in routine work setting, including taking precautions regarding normal hazards, was no more than mildly limited. *Id.* Mr. Hardison also concluded that the plaintiff's ability to make simple decisions was mildly to possibly moderately limited and that he would need assistance in "making appropriate judgments regarding disbursements of funds" based on his significant cognitive limitations and history of substance abuse. *Id.* Mr. Hardison noted that "an assessment of adaptive skills was not requested." *Id.*

In a Medical Source Statement, Mr. Hardison opined that the plaintiff had moderate limitations making judgments on complex work-related decisions and understanding, remembering, and carrying out complex instructions. (Tr. 396.) He also opined that the plaintiff had mild to moderate limitations interacting appropriately with coworkers, supervisors, and the general public, as well as responding appropriately to usual work situations and to changes in a routine work setting. (Tr. 397.)

## 2.    Physical Impairments

As a child, the plaintiff underwent left eye surgery for correction of muscle weakness, resulting in loss of vision in that eye. (Tr. 223, 227, 635, 639.) He can see lights but no objects with his left eye.[11] (Tr. 635, 639.)

From 1999 until 2005, the plaintiff received chiropractic treatment at Gateway Chiropractic Clinic where he was diagnosed with lumbago and lumbosacral radiculitis.[12] (Tr. 177-207, 274-76.) Although he often demonstrated improvement, the relief was temporary, and he experienced decreased range of motion and trouble sleeping due to his back pain. (Tr. 177-207.) On August 23, 2004, the plaintiff presented to the Cumberland Medical Center emergency room with low back pain radiating down his legs and occasional numbness. (Tr. 210-18.) X-rays of his lumbar spine showed "[d]egenerative disc changes at L2-3 and possibly L3." (Tr. 218.)

On August 27, 2004, the plaintiff presented to Dr. Gary Morris at the Crossville Medical Group with complaints of lower back pain radiating down his left leg. (Tr. 165.) Dr. Morris' examination revealed bilateral lumbar muscle spasms, moderate tenderness, and stiffness while walking, and a straight leg raise test was positive bilaterally at forty-five degrees. *Id.* Dr. Morris diagnosed the plaintiff with osteoarthritis, muscle strain, and sciatica; prescribed Anaprox and

---

[11] The plaintiff testified that his parents told him that he had sat "so close to the TV" that "it pulled [his] eye in," so he had to have surgery, which left him totally blind in that eye. (Tr. 718.)

[12] Lumbago is "[p]ain in the lower back and buttock(s) due to vascular insufficiency." Dorland's at 1069. "Lumbosacral" pertains to the "loins and sacrum," and "radiculitis" is the "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." *Id.* at 1069, 1562.

Skelaxin;[13] and indicated his intent to arrange an MRI of the plaintiff's lumbar spine in the event he was eligible for workers' compensation. *Id.*

On October 19, 2004, the plaintiff presented to Dr. Richard Douglas Smith at Jamestown Internal Medicine, and he was diagnosed with low back pain and hypertension. (Tr. 261.) He returned on November 16, 2004, complaining of back pain that "ben[t] him over" and rendered him unable to straighten his back. (Tr. 260.) An MRI of his lumbar spine on November 18, 2004, revealed degenerative disc disease at L2-3 and L3-4, but "[n]o significantly bulging or herniated discs" nor central canal or neural foraminal stenosis.[14] (Tr. 265.) On December 14, 2004, Dr. Smith saw the plaintiff for a follow-up and diagnosed hyperlipidemia, low back pain, hypertension, and gastroesophageal reflux disease ("GERD"). (Tr. 259.)

On December 22, 2004, Dr. Glenda Knox-Carter, a DDS nonexamining consultative physician, completed a Physical Residual Functional Capacity ("RFC") assessment. (Tr. 220-27.) Dr. Knox-Carter opined that the plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk about six hours and sit about six hours in an eight-hour workday, and push and/or pull without limitations. (Tr. 221.) She also opined that the plaintiff could frequently perform postural activities and had no manipulative, communicative, or environmental limitations, but that he had limited depth perception because of "monocular vision with no vision in his left eye." (Tr. 222-24.) She found the plaintiff's allegations of pain to be "currently partially credible," but she expected him to improve with continued treatment. (Tr. 225.)

---

[13] Anaprox is a nonsteroidal anti-inflammatory drug used to treat osteoarthritis and other mild to moderate pain. Saunders at 48. Skelaxin is a skeletal muscle relaxant. *Id.* at 646.

[14] Stenosis is "an abnormal narrowing of a duct or canal." Dorland's at 1757.

The plaintiff visited Dr. Smith once a month between January 11, 2005, and August 24, 2005, for back pain and other medical issues. (Tr. 251-58.) He was diagnosed with degenerative disc disease, lower back pain, hypertension, GERD, and back strain, and he was prescribed Hydrocodone and Soma for his back pain. *Id.*

On February 24, 2005, Dr. Robert S. Davis, saw the plaintiff for a neurosurgical evaluation on referral from Dr. Smith. (Tr. 241.) Dr. Davis reviewed the plaintiff's November 18, 2004 MRI and concluded that he had "early degenerative disc disease at L2-3 and L3-4," "questionable disc bulge at L4-5 on the left with recessed narrowing," and "questionable lateral recessed narrowing on the right at L2-3, L3-4, and L4-5." (Tr. 240.) Dr. Davis' impression was "[m]echanical lower back pain with intermittent left lower extremity pain," and he referred the plaintiff for physical therapy and fitted him with a lumbar brace. *Id.*

The plaintiff underwent physical therapy at Cumberland Medical Center for lumbago and lumbosacral neuritis from March 1, through March 17, 2005. (Tr. 228-36.) He variously rated his pain between 2 and 6 on a 10-point scale and indicated that his pain level generally fell after treatment. (Tr. 231-32.) He was discharged after meeting his treatment goals on March 17, 2005. (Tr. 228, 230-31.)

On March 30, 2005, Dr. Davis discussed with the plaintiff the risks, benefits, and alternatives of a left L2-3, L3-4, and L4-5 laminectomy[15] for lateral recessed stenosis. (Tr. 239.) The plaintiff elected to continue with conservative, non-surgical treatment, and Dr. Davis advised him to pursue his activities as tolerated and to return if needed for surgery.[16] *Id.*

---

[15] A laminectomy is the "excision of the posterior arch of a vertebra." Dorland's at 996.

[16] The plaintiff testified that Dr. Davis told him that surgery would not help him. (Tr. 717.)

On June 1, 2005, Dr. Smith completed a Medical Source Statement assessing the plaintiff's physical ability to do work-related activities. (Tr. 246-49.) Dr. Smith opined that the plaintiff could lift and/or carry less than ten pounds both occasionally and frequently, stand and/or walk less than two hours in an eight-hour workday, and sit less than two hours in an eight-hour workday. (Tr. 246.) He also opined that the plaintiff had a limited ability to push and/or pull with his lower extremities due to weakness from degenerative disc disease, that he had pain that was frequently severe enough to interfere with attention and concentration, that he was incapable of handling even low-stress jobs, that he would need to take unscheduled breaks during an eight-hour workday, and that he would likely miss work more than four times per month. (Tr. 247.) Dr. Smith concluded that the plaintiff could never climb, balance, stoop, kneel, crouch, or crawl because that would require strength in his lower extremities; that he was limited to occasional reaching due to lower back pain; and that he should avoid concentrated exposure to extreme cold or heat, noise, dust, vibration, humidity/wetness, hazards like machinery or heights, fumes, odors, dusts, gases, perfumes, solvents/cleaners, soldering fluxes, cigarette smoke, or chemicals. (Tr. 248.)

The plaintiff continued to seek treatment for back pain through 2005 and 2007. MRIs and x-rays of his lumbar spine during this time showed "[m]ultilevel degenerative disc disease." (Tr. 262, 333, 358.) He frequently presented to Gary Burks, a physician's assistant in Dr. Smith's office, for a number of ailments, including back pain for which Mr. Burks prescribed Hydrocodone and Soma. (Tr. 341, 345, 347-48, 594, 596-98, 600.) He occasionally went to the Cumberland Medical Center emergency room with back pain, and, on one occasion, he was prescribed a cane. (Tr. 407-15, 504-10.) He also received a number of epidural steroid injections in 2007. (Tr. 382-84, 387-88, 582-83, 564-67.)

On June 6, 2007, the plaintiff was examined by Dr. Edward Johnson, a DDS consultative physician. (Tr. 360-64.) Dr. Johnson found muscle spasm, hypertrophy, and limited range of motion in the plaintiff's lumbar spinal muscles but noted that the plaintiff held himself "very guarded and rigid," making Dr. Johnson "uncertain as to whether this [was] a true accurate account of range of motion." (Tr. 362.) A supine straight leg raise was positive for pain at sixty degrees bilaterally, but the plaintiff was "very guarded and rigid and did not permit further movement." *Id.* He had full range of motion in his joints and full strength in his grip and upper extremities, but he had decreased sensation in his left leg. (Tr. 363.) Dr. Johnson noted the plaintiff's x-rays showing "mild to moderate generalized degenerative disk disease throughout the lumbar spine," "moderate spondylosis of the facet joints at L4-5 and L5-S1, greater on the right side," mild bilateral sacroiliitis,[17] and "slight" scoliosis. (Tr. 363-64.)

Dr. Johnson completed a Medical Source Statement (tr. 366-72), opining that the plaintiff could lift up to ten pounds continuously, 11-20 pounds frequently, and 21-50 pounds occasionally and that he could carry up to ten pounds frequently and 11-20 pounds occasionally. *Id.* He opined that the plaintiff could sit for four hours continuously for a total of five hours a day, stand for three hours continuously for a total of five hours a day, and walk for three hours continuously for a total of four hours a day. (Tr. 367.) Dr. Johnson determined that the plaintiff did not need a cane to ambulate and that he could continuously reach, handle, finger, feel, push/pull with either hand; frequently operate foot controls with either foot; occasionally climb, balance, stoop, or kneel; but never crouch or crawl. (Tr. 368-69.) He also noted that plaintiff was blind in his left eye and functionally illiterate. (Tr. 369.) He opined that the plaintiff could never tolerate exposure to

[17] Sacroiliitis is "inflammation (arthritis) in the sacroiliac joint." Dorland's at 1650.

unprotected heights or moving mechanical parts[18] but that he could occasionally tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, or vibrations. (Tr. 370.) He also opined that the plaintiff could shop, care for personal hygiene, prepare a simple meal, feed himself, use public transportation, climb a few steps at a reasonable pace without using a handrail, travel without a companion for assistance, and sort and handle paper files. (Tr. 370-71.)

Lumbar scans continued to show degenerative changes. An x-ray on May 23, 2008, showed multilevel degenerative disc disease at L2-3 and L3-4 with "[v]ertebral body heights preserved" and no indication of spondylosis or spondylolisthesis.[19] (Tr. 535.) A July 2, 2008 MRI confirmed these findings and showed "loss of height and loss of signal most prominently at L2-3 and L3-4" and to a lesser extent at L4-5, but no central canal stenosis. (Tr. 404, 530.) From June 2008 to April 2009, the plaintiff presented to Dr. Harold Lowe at the Rural Health Clinic of the Cumberlands for treatment of various maladies, frequently including back pain, and medication refills. (Tr. 645-47.)

On December 10, 2008, Dr. Jerry Lee Surber, a DDS consultative physician, physically examined the plaintiff. (Tr. 632-35.) Dr. Surber noted that the plaintiff was "very poorly cooperative during all parts of this exam" and was "hesitant to move." (Tr. 633.) The plaintiff was able to perform the straightaway, tandem, and heel-toe walks without the assistance of a cane, but Dr. Surber found some tenderness in the lumbar spine. (Tr. 634.) The plaintiff had full mobility in

---

[18] On his Medical Source Statement, Dr. Johnson checked boxes indicating that the plaintiff could "never" and "frequently" operate a motor vehicle. (Tr. 370.)

[19] Spondylolisthesis is the "forward displacement (olisthy) of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth, usually due to a developmental defect in the pars interarticularis." Dorland's at 1743.

his shoulders, hips, knees, and ankles, but was only able to do a "squat and stand maneuver" about one half of the way down before complaining of pain in his lower back and tightness in both knees. *Id.* He performed straight leg raises in the sitting and supine positions with the same complaints. *Id.* He could stand on one leg but "appeared shaky whether standing on his right or his left leg." *Id.* Dr. Surber concluded that the plaintiff could frequently lift or carry at least 10 to 40 pounds during up to 1/3 to 2/3 of an eight-hour workday; stand or walk for 2-6 hours in an eight-hour workday; and sit 6-8 hours in an eight-hour workday. (Tr. 635.)

Dr. Surber also completed a Medical Source Statement in which he opined that the plaintiff could lift and carry up to twenty pounds continuously and 21-40 pounds frequently; sit 6-8 hours in an eight-hour workday; and stand or walk 2-6 hours in an eight-hour workday without the use of a cane. (Tr. 636-37.) He also opined that the plaintiff could occasionally reach overhead; frequently reach in all other directions; continuously handle, finger, feel, push or pull; continuously operate foot controls; never climb stairs, ramps, ladders, or scaffolds; and occasionally balance, stoop, kneel, crouch, or crawl. (Tr. 637-39.) Dr. Surber concluded that the plaintiff had a visual impairment based on left-eye blindness and illiteracy, could never tolerate exposure to unprotected heights, could frequently tolerate exposure to moving mechanical parts, could continuously tolerate other environmental limitations, and could tolerate moderate to very loud noise. (Tr. 639-40.) Dr. Surber opined that the plaintiff could shop, travel without a companion for assistance, walk without an assistive device, walk a block at a reasonable pace on an uneven surface, use public transportation, climb a few steps at a reasonable pace without using a handrail, prepare a meal and feed himself, care for his personal hygiene, and sort and handle paper files. (Tr. 641.)

**B.     Hearing Testimony**

At the video hearing held on May 27, 2009, the plaintiff was represented by counsel and both the plaintiff and Edward Smith, a vocational expert ("VE") testified.  (Tr. 708-30.)  The plaintiff testified that he was divorced, had a driver's license, completed the ninth grade, and had difficulty reading and writing.  (Tr. 712-13.)  He testified that he had not worked since 2004 due to back pain. (Tr. 713-15.)

The plaintiff testified that he took pain medication and suffered no side effects.  (Tr. 717.) He said that he had been a heavy drinker but that, since 2004, he had only used alcohol occasionally. (Tr. 718.)  He testified that he previously smoked marijuana on a consistent basis but quit in an effort to regain custody of his daughter.  (Tr. 719.)  He explained that he experienced back pain on a daily basis, especially when the weather was rainy or when he performed daily activities such as sweeping, mopping, or washing dishes.  *Id.*  He related that he spent a typical day "sitting around a lot and moving around a little bit" and that he had increased difficulty getting out of bed in the last six months due to pain.  (Tr. 719, 722.)  He said that his father and sister helped him pay bills and that he has difficulty knowing the amount of change that he should receive when he buys groceries or pays bills at the utility company.  (Tr. 721.)

The plaintiff described his low back pain as "a sharp knife cutting you" and said that the pain radiated down his left leg and occasionally to his toes.  (Tr. 723.)  He explained that the pain radiated down his leg when he attempted to "do a lot," such as mopping or frequent standing or lifting. (Tr. 724.)  He estimated that he could mop for approximately 10-15 minutes and stand for approximately twenty minutes before his leg went numb.  *Id.*  He also estimated that he could sit for approximately twenty minutes before he had to stand up.  *Id.*  He testified that he generally avoided

lifting more than a gallon of milk in order to avoid back pain and that he had to lie down 2-3 times a day. (Tr. 724-26.) The plaintiff also testified that, in addition to back pain, he had occasional chest pain that would last for approximately 15-20 minutes and that he assessed as a 6 out of 10 on the pain scale. (Tr. 725.)

The VE classified the plaintiff's work as a carpenter's helper, laborer, press operator, loader, and pallet builder as heavy and unskilled. (Tr. 727.) The ALJ asked the VE to assess the employment opportunities for a hypothetical person who was restricted to work at the medium exertional level, had no vision in his left eye, had difficulty reading and writing, and was restricted to simple, unskilled work. (Tr. 727-28.) The VE responded that such an individual could work as a hand packager, machine cleaner, or laundry laborer. *Id.* The ALJ then limited the hypothetical person to work at the light exertional level and added limitations for no more than occasional postural activities. (Tr. 728.) The VE testified that such a person could work as a sorter, laundry folder, or housekeeper. *Id.* Finally, the ALJ asked the VE to consider a hypothetical person who, due to severe pain, was unable to complete an eight-hour workday on a regular basis. (Tr. 729.) The VE testified that such a person would be precluded from all work. *Id.*

### III. THE ALJ'S FINDINGS

On remand, the ALJ issued an unfavorable decision on August 31, 2009. (Tr. 12-24.) Based upon the record, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social Security Act
        through December 31, 2010.

2.      The claimant has not engaged in substantial gainful activity since August 24, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).[20]

\* \* \*

3.      The claimant has the following severe impairments: degenerative disc disease, mild mental retardation, anxiety disorder, not otherwise specified, cannabis abuse, obesity, alcohol dependence in remission, and left eye blindness (20 CFR 404.1520(c) and 416.920(c)).

\* \* \*

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925, and 416.926).

\* \* \*

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that he will be precluded from work requiring literacy, binocular vision, and depth perception. He can perform simple, unskilled work. He also has little ability to read or write.

\* \* \*

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\* \* \*

7.      The claimant was born on April 16, 1964 and was 40 years old, which is defined as a "younger individual", on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant is illiterate and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

---

[20] The ALJ found that the plaintiff earned wages of $7,810 in 2007, but determined that, although this work activity was "probative of [the plaintiff's] ability to work," it did not rise to the level of substantial gainful activity. (Tr. 14.) It is not clear to the Court where the ALJ found evidence of work activity in 2007. The plaintiff testified that he last worked in 2004 (tr. 713), and the plaintiff's earnings report shows wages only through 2003. (Tr. 84-89.)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

* * *

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 24, 2004 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-24.)

# IV. DISCUSSION

## A.    Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206

(1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is

one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant

work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, he is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

**B.     The Five-Step Inquiry**

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since his alleged onset date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had a severe combination of impairments including degenerative disc disease, mild mental retardation, anxiety disorder NOS, cannabis abuse, obesity, alcohol dependence in remission, and left-eye blindness. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) At step four, the ALJ determined that the plaintiff was not capable of performing his past relevant work as a carpenter's helper, pallet builder, and odd job worker. (Tr. 22.) At step five, the ALJ determined that the plaintiff could work as a hand packer, machine cleaner, laundry laborer, laundry folder, housekeeper, or sorter. (Tr. 23.)

**C.     The Plaintiff's Assertions of Error**

The plaintiff contends that the ALJ erred by determining that he did not meet or equal Listing 12.05C and by rejecting the opinion of his treating physician, Dr. Smith. Docket Entry No. 18, at 16-19. The plaintiff first argues that he meets the criteria of Listing 12.05C for mental retardation

and is entitled to a finding of disability at step three of the five-step sequential evaluation process. Docket Entry No. 18, at 16-18. The Commissioner argues that the ALJ correctly found that the plaintiff failed to meet the requirements of Listing 12.05C. Docket Entry No. 25, at 22-23.

The plaintiff has the burden of proof at step three to demonstrate that "he has or equals an impairment" listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Little v. Astrue*, 2008 WL 3849937, at *4 (E.D. Ky. Aug. 15, 2008) (quoting *Arnold v. Comm'r of Soc. Sec.*, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532 (1990). If the plaintiff demonstrates that his impairment meets or equals a listed impairment, the ALJ must find the plaintiff disabled. *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

The relevant listing, Section 12.05C, provides that:

Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

\* \* \*

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. The plaintiff must satisfy not only the specific requirements set forth in section C but must also satisfy the criteria in the introductory paragraph,

24

known as the diagnostic description. *Russell v. Astrue*, 2008 WL 5130103, at *2 (E.D. Tenn. Dec. 4, 2008) (citing *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001) ("A claimant must demonstrate that [his] impairment satisfies the diagnostic description for the listed impairment in order to be found disabled thereunder.")). Therefore, to demonstrate a claim of disability under Listing 12.05C, the plaintiff must prove that he meets the following criteria: (1) significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period (before age 22); (2) a valid verbal, performance, or full scale IQ score of 60 through 70; and (3) a physical or other mental impairment that significantly limits his ability to work. *Id.* (citing *West v. Comm'r of Soc. Sec.*, 240 Fed. Appx. 692, 698 (6th Cir. July 5, 2007)); 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.

The plaintiff argues that he meets Listing 12.05C because he "possess[es] the requisite IQ scores (60 through 70) and [has] a 'physical or other mental impairment imposing an additional and significant work-related limitation of function.'" Docket Entry No. 18, at 16. The defendant argues that the plaintiff "mischaracterizes" the listing by ignoring the diagnostic description and contends that the plaintiff failed to "demonstrate the requisite deficit in adaptive functioning." Docket Entry No. 25, at 22.

The defendant does not contest that the plaintiff meets the second and third requirements of Listing 12.05C. The plaintiff meets the second requirement of Listing 12.05C because he has a valid verbal, performance, or full scale IQ score of 60 through 70. The plaintiff was administered the WAIS-III by Jerell Killian on October 10, 2007, and he obtained a verbal IQ score of 66, a performance IQ score of 63, and a full scale IQ score of 62, placing him in the first percentile. (Tr. 374.) On August 25, 2008, Stephen Hardison administered the WAIS-III, and the plaintiff

obtained a verbal IQ score of 64, a performance IQ score of 63, and a full scale IQ score of 61. (Tr. 402.)  Both psychological examiners opined that these scores were representative of the plaintiff's true intellectual functioning and neither detected signs of malingering or poor effort. (Tr. 375, 399.)

The plaintiff also meets the third requirement of Listing 12.05C, which requires him to have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  In addition to finding that the plaintiff had mild mental retardation, the ALJ also found that the plaintiff had the severe impairments of degenerative disc disease, anxiety disorder NOS, cannabis abuse, obesity, alcohol dependence in remission, and left-eye blindness.  (Tr. 14.)  The ALJ determined that the plaintiff's impairments limited him to medium work and precluded him from performing his past relevant work at the "heavy exertion" level.  (Tr. 19-22.)  This assigned reduction in work activities satisfies the "additional and significant work-related limitation of function" requirement of Listing 12.05C because not being able to perform one's past work and reducing one's overall exertion level are "significant" limitations pertaining to one's ability to perform work.  *Compare Mowery v. Heckler*, 771 F.2d. 966, 972 (6th Cir. 1985) (finding that the plaintiff's physical impairments that inhibited him from performing heavy labor and limited him to light work with restrictions were significant), *with Gribbins v. Apfel*, 14 Fed. Appx. 491, 492 (6th Cir. July 10, 2001) (finding that the plaintiff's mental impairment was not significant because it did not alter her RFC and that she was able to find a different job in the equivalent category of her past, relevant work).

The defendant argues, however, that the plaintiff does not meet the diagnostic description of Listing 12.05C because he failed to demonstrate deficits in adaptive functioning.  Docket Entry

No. 25, at 22. The ALJ found that the plaintiff's adaptive functioning throughout his life was higher than his IQ scores would otherwise indicate:

> [The plaintiff's] IQ scores are not consistent with the level of adaptive functioning the [plaintiff] has performed throughout his life. He has successfully worked as a carpenter helper and pallet builder. Moreover, he lives alone, drives, manages money, and performs routine household chores. He also goes to grocery stores, plays cards and video games, visits family, and watches television. The [plaintiff's] ability to perform all of these activities in a successful manner shows that his level of adaptive functioning is higher than what his IQ scores suggest. For these reasons, it is found that the [plaintiff] does not meet the criteria of section 12.05(C). . . .

(Tr. 19.)

A plaintiff's claim often succeeds or fails based on whether he or she can demonstrate deficits in adaptive functioning. *See* Report and Recommendation entered in *Sandlin v. Astrue*, 2012 WL 2030175, at *11-12 (S.D. Ohio, June 6, 2012) and adopted by the Court (collecting cases evaluating adaptive functioning). Adaptive functioning includes "a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West*, 240 Fed. Appx. at 698 (citing *Heller v. Doe*, 509 U.S. 312, 329, 113 S. Ct. 2637, 125 L. Ed. 2d 257 (1993)). As the Sixth Circuit has noted, "[t]he American Psychiatric Association defines adaptive-skills limitations as '[c]oncurrent deficits or impairments . . . in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'" *Hayes v. Comm'r of Soc. Sec.*, 357 Fed. Appx. 672, 677 (6th Cir. Dec. 18, 2009) (quoting DSM-IV-TR at 49).

In *Brown v. Secretary of Health and Human Services*, 948 F.2d 268, 270 (6th Cir. 1991), the Sixth Circuit found that a valid IQ score of 68 was not mutually exclusive of the plaintiff's ability

and independence to complete daily activities. In that case, the Commissioner argued that the plaintiff's IQ score of 68 was inconsistent with his functional abilities because:

> Mr. Brown is able to use public transit; he has a driver's license; he visits friends; he is able to make change at a grocery store; he can do his own laundry and clean his room; he completed the sixth grade; he has a limited level of reading comprehension (Mr. Brown stated that he can follow a road atlas, and a friend testified she had seen him reading a newspaper); and as a truck driver, Mr. Brown recorded mileage, the hours he worked, and the places he drove.

*Id.* The Sixth Circuit concluded that such activities did not preclude a finding of disability under Listing 12.05C, noting that "[t]he regulations specify that IQ scores ranging from '60 through 70' qualify an individual as mentally retarded." *Id.* The Sixth Circuit explained that individuals with mild mental retardation:

> By their late teens . . . *can acquire academic skills up to approximately sixth-grade level; during their adult years, they usually achieve social and vocational skills adequate for minimum self-support*, but may need guidance and assistance when under unusual social or economic stress. At the present time, *virtually all people with Mild Mental Retardation can live successfully in the community, independently* or in supervised apartments or group homes (unless there is an associated disorder that makes this impossible).

*Id.* (Emphasis in original) (quoting DSM-III-TR § 317.00).

Consequently, when a plaintiff's activities are consistent with those activities that a person with mild mental retardation is able to perform, it is improper for the ALJ to find that the plaintiff's IQ scores are not representative of his or her true level of functioning. *See Dragon v. Comm'r of Soc. Sec.*, 470 Fed. Appx. 454, 461-63 (6th Cir. March 26, 2012) (finding that plaintiff's activities were not inconsistent with her IQ scores; thus the ALJ's decision to invalidate her IQ scores was not supported by substantial evidence). *See also* Report and Recommendation entered in *Yates v. Astrue*, 2009 WL 2611276, at *12 (M.D. Tenn. Aug. 25, 2009) and adopted by the Court (Nixon, J.) ("Given

that the plaintiff's verbal IQ score was 70, the ALJ's finding that plaintiff did not suffer from mild mental retardation because of his daily activities is simply incorrect."). *But see Courter v. Comm'r of Soc. Sec.,* 479 Fed. Appx. 713, 721 (6th Cir. May 7, 2012) (citing the plaintiff's work history and ability to cook, clean, shop, keep track of medical appointments, maintain personal hygiene as evidence that plaintiff was not mentally retarded); *West*, 240 Fed. Appx. at 698 (citing the plaintiff's ability "to drive a garbage truck on a part-time basis, to care for his daily needs, to pay bills, to shop for groceries, to interact with friends and families, and to engage in numerous other daily activities" as evidence that the plaintiff was not deficient in adaptive functioning).

In this case, the ALJ cited the plaintiff's ability to live alone, drive, manage money, perform routine household chores, go to the grocery store, visit family, play cards and videogames,[21] and watch television as evidence of adaptive functioning inconsistent with a finding of disability under Listing 12.05C. However, these are just the sort of basic activities that a person with mild mental retardation is capable of performing. The plaintiff has been diagnosed as mildly mentally retarded on multiple occasions, his test scores are consistent with this diagnosis, and he performs daily activities that are not inconsistent with this diagnosis. Thus, it was incorrect for the ALJ to find that these activities are incompatible with a finding of disability under Listing 12.05C.

The Court also finds that the ALJ's conclusion that the plaintiff is able to manage money is not supported by substantial evidence in the record. Although the plaintiff told Mr. Hardison that he can count money "pretty good," he also told Mr. Hardison that he sometimes forgets to pay bills and had lost money without knowing "where it went." (Tr. 400-01.) The plaintiff also testified that

---

[21] The ALJ was referring to Mr. Hardison's evaluation in which he reported that the plaintiff's hobbies included "watch the [*sic*] play cards and playing [N]intendo" without any specificity as to which card games or Nintendo games the plaintiff plays. (Tr. 401.)

he had difficulty making change and that his father and sister helped him pay bills. (Tr. 721.) He reported that he had a checking account for a short period of time but that it was managed by someone else. (Tr. 374, 400.) Mr. Hardison found that he had "significant cognitive limitations," as well as a history of substance abuse, and "would need assistance in making appropriate judgments regarding disbursements of funds."[22] (Tr. 403.) There is very little evidence supporting the ALJ's conclusion that the plaintiff can manage money and substantial evidence to the contrary.

The ALJ also cited the plaintiff's "successful" work experience as a carpenter's helper and pallet builder as evidence of adaptive skills. (Tr. 19.) The plaintiff worked at a number of heavy, unskilled jobs, including as a carpenter's helper from 1994-1996 and as a pallet builder from 1997-

---

[22] Additionally, Mr. Killian opined that the plaintiff had moderate limitations in his ability to calculate and moderate to severe limitations in the areas of reasoning, comprehension, memory, and reading. (Tr. 375.) The ALJ found that Mr. Killian's opinions were not supported by the record and "emphasized" that the plaintiff did not go to Mr. Killian for treatment but in "an effort to generate evidence" and that Mr. Killian was "presumably paid for the report." (Tr. 21-22.)

The ALJ's reasoning is flawed in two respects. First, a wealth of evidence supports Mr. Killian's conclusions that the plaintiff had significant limitations in his ability to calculate, reason, comprehend, remember, and read. The ALJ found that the plaintiff is illiterate (tr. 22), and she credited Mr. Hardison's report, which placed the plaintiff's reading and arithmetic grade levels in the 0.3 percentile of the population. (Tr. 401-02.) Mr. Hardison also documented the plaintiff's reports that he had "problems concentrating on 'puzzles and stuff'" (tr. 400) and concluded that the plaintiff "would need assistance in making appropriate judgments regarding disbursement of funds." (Tr. 403.) The objective scores obtained during Mr. Killian's examination are substantially similar to the scores obtained by Mr. Hardison, and the ALJ did not discredit Mr. Killian's test results. (Tr. 374, 402.) The record supports Mr. Killian's conclusions.

Second, the ALJ's hypotheses regarding the motives behind Mr. Killian's report are without support in the record, and she cites no support for the proposition that a medical consultant to whom the plaintiff was referred by his attorney is worthy of less credence than a consultant to whom the plaintiff was referred by the SSA. As the Sixth Circuit has explained, "[t]here is nothing fundamentally wrong with a lawyer sending a client to a doctor, especially when the capacity of that client to care for himself is questionable." *Blankenship v. Bowen*, 874 F.2d 1116, 1122 n.8 (6th Cir. 1989).

1999. (Tr. 102-108, 727.) He last worked in 2004 as a press loader, and he testified that he stopped working due to back pain. (Tr. 102-08, 713-14.)

The Listings generally provide that work experience is not a relevant factor when determining whether a plaintiff meets or equals a listed impairment. *See* 20 C.F.R. § 416.920 ("If you have an impairment(s) which . . . is listed in Appendix 1, we will find you disabled without considering your age, education, and work experience."). However, the Sixth Circuit has considered a plaintiff's past work experience as a factor in determining whether the plaintiff has demonstrated a level of adaptive functioning inconsistent with a finding of disability under Listing 12.05C. *See, e.g., Justice v. Comm'r of Soc. Sec.*, 515 Fed. Appx. 583, 587 (6th Cir. Feb. 22, 2013); *Courter*, 479 Fed. Appx. at 721; *Carmack v. Barnhart*, 147 Fed. Appx. 557, 560-61 (6th Cir. Aug. 31, 2005); *Daniels v. Comm'r of Soc. Sec.*, 70 Fed. Appx. 868, 872-73 (6th Cir. July 30, 2003); *Foster*, 279 F.3d at 355. When reviewing a plaintiff's work history for evidence of adaptive functioning, courts have considered the relative complexity of the plaintiff's prior work, *see Carmack*, 147 Fed. Appx. at 560-61, as well as whether the plaintiff stopped working due to mental deficiencies or for other reasons. *See Carter v. Comm'r of Soc. Sec.*, 2012 WL 1028105, at *6-7 (W.D. Mich. March, 26, 2012).

In this case, the plaintiff worked consistently, albeit at a number of different jobs, from 1984 to 2004, and he testified that he stopped working due to a physical impairment. These factors support the ALJ's determination. On the other hand, the plaintiff worked only heavy, unskilled jobs of limited complexity, and, by reducing the plaintiff's RFC, the ALJ established that the plaintiff could no longer perform these jobs. Listing 12.05C contemplates a person who suffers from mental retardation plus an additional impairment. The fact that the plaintiff was formerly able to work

heavy labor jobs, jobs which the ALJ found he can no longer perform, does not disqualify him from meeting the listing.

The ALJ was permitted to consider the plaintiff's work history as a factor in determining his level of adaptive functioning. However, given the ALJ's mistaken reliance on the plaintiff's daily activities, as well as her erroneous conclusion that the plaintiff is able to manage money, the plaintiff's work history alone does not provide a sufficient basis for the ALJ's decision. The ALJ's decision ignores a wealth of evidence and lacks substantial support in the record.

Results of objective testing throughout the plaintiff's life indicate that he functions in the range of mild mental retardation. (Tr. 159-61, 373-75, 399-403.) He is functionally illiterate and reads at a second-to third grade level. (Tr. 374, 402.) His reading skills are in the 0.3-0.4 percentile. *Id.* He was able to obtain a driver's license by taking a test that only involved identifying road signs, and he reported that he drove to the store "every month or so." (Tr. 374, 401, 721.) He performs arithmetic at below a third grade level, needs assistance paying bills, and has difficulty knowing the amount of change he should receive when he buys groceries. (Tr. 374, 402, 721.) He has never been able to successfully manage a checking account by himself. (Tr. 374, 400.)

Although the plaintiff testified that he is able to wash laundry and dishes, mop, and sweep, he also told Mr. Hardison that a female friend helped him with most chores. (Tr. 401, 720.) CRG assessments completed by Volunteer staff members assessed him as having moderate limitations in the areas of concentration, task performance, and pace; adaptation to change; and in the activities of daily living, meaning he "[h]as regular or frequent problems with performing daily routine activities and is unable to perform up to acceptable standards without frequent assistance." (Tr. 606-

07, 661-62.) Mr. Hardison opined that the plaintiff had mostly mild to moderate limitations; however, his report suggested that he had not assessed the plaintiff's adaptive skills.[23] (Tr. 396-403.)

The plaintiff indeed lives alone, but he lives in a camper trailer provided by his father and located on his father's property. (Tr. 15, 720.) He reported that he visited with his father approximately once a week, got along with one neighbor, and had a female friend who "stay[ed] with him part of the time" (tr. 399, 401), but he also exhibited deficiencies in social functioning. CRG assessments completed by Volunteer staff rated the plaintiff as having moderate limitations in social functioning, finding that he had "limited integration in [the] community" and "few friends." (Tr. 606, 661.) Mr. Hardison opined that the plaintiff had mild to moderate limitations interacting appropriately with coworkers, supervisors, and the general public. (Tr. 397, 403.) The plaintiff's daughter was apparently in foster care (tr. 399, 720), and he has attempted suicide in the past. (Tr. 616-17, 625.)

Listing 12.05C requires only that the plaintiff demonstrate "deficits in adaptive functioning," and he has clearly done so. The ALJ's finding to the contrary is not supported by substantial evidence.

Additionally, the evidence in the record shows that the plaintiff's intellectual and adaptive deficits manifested prior to age 22.[24] Mr. Rutledge's test results, although not resulting in a formal

---

[23] The Court is perplexed by Mr. Hardison's note that an "assessment of adaptive skills was not requested" (tr. 403) because it appears that Mr. Hardison did, in fact, suggest limitations in several areas related to adaptive functioning. Mr. Killian, whose report the ALJ did not credit, opined that the plaintiff's IQ scores were "consistent" with his school records and adaptive functioning. (Tr. 374.)

[24] The ALJ did not specifically address whether the plaintiff's intellectual and adaptive deficits initially manifested prior to age 22. (Tr. 19.)

IQ score, support the conclusion that the plaintiff's intellectual deficits manifested prior to age 22. *See West*, 240 Fed. Appx. at 698 ("While the claimant *may* use a qualifying IQ score before the age of 22 to demonstrate that his subaverage intellectual functioning initially manifested during his developmental period . . . [he] is by no means *required* to produce an IQ score obtained prior to age 22."). Additionally, the plaintiff was enrolled in a school resource program, yet he failed to advance beyond the ninth grade even with material adapted to suit his needs. (Tr. 159-61, 713.) He never advanced beyond the third-grade reading level and remains functionally illiterate. (Tr. 373-75, 402.) Taken as a whole, these factors clearly indicate that the plaintiff's deficits in intellectual and adaptive functioning manifested before he reached age 22.

In sum, the Court concludes that the plaintiff meets all of the criteria for a finding of disability under Listing 12.05C. An ALJ's decision should be affirmed "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Courter*, 479 Fed. Appx. at 721. *See also Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . [T]here is a 'zone of choice' within which the Commissioner can act, without the fear of court interference."). However, in this case, the ALJ's finding that the plaintiff demonstrated a level of adaptive functioning incompatible with Listing 12.05C is not supported by substantial evidence in the record.

The plaintiff meets Listing 12.05C and is "disabled" as defined by the Act. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. In light of this finding, it is not necessary to address the plaintiff's remaining assertion of error that the ALJ failed to assign proper weight to Dr. Smith's medical

opinion. If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. *See* 20 C.F.R. § 404.1520(a)(4).

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 17) be GRANTED and that the decision of the ALJ be reversed and benefits awarded.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge